**The DISTRICT OF COLUMBIA, a Municipal Corporation, et al., Appellants,**

v.

**Arthur H. KEYES, Jr., and Lucille Keyes, on behalf of themselves and others similarly situated, Appellees.**

**No. 8790.**

District of Columbia Court of Appeals.

Argued Dec. 5, 1974.*

Decided July 23, 1976.

* At the court's request, supplemental post-argument memoranda were submitted by the parties in March 1976.

Louis P. Robbins, Principal Asst. Corp. Counsel, Washington, D.C., with whom C. Francis Murphy, Corp. Counsel at the time the brief was filed, Henry E. Wixon, Richard L. Aguglia, and Kenneth A. Pels, Asst. Corp. Counsels, Washington, D.C., were on the brief, for appellants.

Gilbert Hahn, Jr., Washington, D.C., with whom Jack C. Sando, Bethesda, Md., was on the brief, for appellees.

Before KELLY and GALLAGHER, Associate Judges, and PAIR, Associate Judge, Retired.

GALLAGHER, Associate Judge:

This is an appeal from the Tax Division of the Superior Court of the District of Columbia. The appellees, Arthur H. Keyes, Jr. and Lucille Kayes, filed suit, on behalf of themselves and others similarly situated, against the District of Columbia, Mayor Walter E. Washington, and the Director of the Department of Finance and Revenue, Kenneth Back, appellants, for partial refunds of taxes paid in fiscal year 1973 on all single-family residential properties in the District of Columbia which were assessed at 60% of estimated market value. The trial court held that the appellees are entitled to the relief sought. We reverse.

During calendar year 1971, the level of assessment[1] on approximately one-third of the single-family residential properties[2] in the District of Columbia was raised from 55% to 60% of estimated market value for fiscal year 1973.[3] This change in the level of assessment was part of a plan by the Department of Finance and Revenue of the District of Columbia to achieve a phased increase in the debasement factor (level of assessment) for all single-family residential properties in the District of Columbia. Appellants seek to have their refunds measured by the difference between their actual tax bills which they paid for fiscal year 1973 (for which a 60% debasement factor was applied) and the lower tax bills which they would have received if a 55% debasement factor had been applied, plus 6% interest per annum.

In May 1973, an earlier class action was brought by several single-family residential property taxpayers to enjoin the District of Columbia from using unequal levels of assessment in taxing single-family residential properties for fiscal year 1974. This court, in *District of Columbia v. Green*, D.C.App., 310 A.2d 848 (1973) (hereinafter *Green*), affirmed the trial court and held that the District of Columbia's "stairstep" approach to achieve an increased debasement factor for all single-family residential properties was unconstitutional as it resulted in different debasement factors being applied to the same

---

1. The level of assessment is also known as the "debasement factor" or "multiplier." This element in the tax computation is the percentage of estimated market value upon which the tax is levied. The assessed value or assessment for an individual piece of real property is obtained by multiplying the estimated market value of the property by the level of assessment. Thus, a dwelling valued at $100,000 is assessed at $55,000 if a 55% debasement factor is applied and at $60,000 if a 60% debasement factor is applied.

2. It is estimated that this suit involves approximately 34,000 properties.

3. Assessments of real property are made on a *calendar* year basis for the subsequent *fiscal* year. Fiscal year 1973 ran from July 1, 1972 to June 30, 1973.

class of property in the same year.[4] Injunctive relief was granted for fiscal year 1974, and the "stairstep" plan was prohibited.

The present suit was brought as an uncertified[5] class action to recover that portion of fiscal year 1973 residential property taxes paid which was attributable to the increase of 5% in the level of assessment.[6] The District of Columbia appeals the decision of the trial court granting refunds to the taxpayers on the grounds that (1) under traditional principles of equity and tax reform litigation only prospective relief should have been granted; (2) refunds should not have been granted without proof that appellees bore a substantially disproportionate share of the real property tax burden; (3) the trial judge erred in not permitting the District of Columbia to prove that appellees did not bear a substantially disproportionate share of the real property tax burden; and (4) the trial court erred in permitting appellees to proceed as a class for refunds without certification and individual notice. We hold that appellees are not entitled to refunds either under the statutes of this jurisdiction or by virtue of equitable principles.

The trial court held, insofar as pertinent here, (1) that under the doctrine of collateral estoppel the legal and factual issues as they relate to the conduct of appellants are controlled by the result in *Green*, and (2) that under principles of equity it would be inappropriate to deny refunds in this case. We believe that, even if the first holding were assumed to be correct, the second is not.

Preliminarily, we observe that this suit was brought in equity and was decided solely on equitable grounds. No statutory remedy was sought or granted and one of the premises of appellees' approach to this litigation is that their potential legal remedies, if any, were inadequate. The rationale of the trial court is essentially that because appellees were held to be entitled to injunctive relief in *Green*, they are *ipso facto* entitled to tax refunds in this case.

■ Recovery of taxes illegally or erroneously assessed and voluntarily paid was not permitted at common law and is a matter within the purview of the legislative branch. Therefore, refunds of taxes so assessed and paid will not be made absent an authorizing statute. *District of Columbia v. McFall,* 88 U.S.App.D.C. 217, 188 F.2d 991 (1951); *Lindner v. District of Columbia,* D.C.Mun.App., 32 A.2d 540 (1943).[7] Under the statutory procedure applicable to this case, the recovery of refunds through

---

4. *District of Columbia v. Green, supra* at 855. Yet not all inequalities in the assessment of property taxes are necessarily unconstitutional. To illustrate, it has occurred frequently that taxpayers pay different tax bills on property of identical values due to the inability of the assessors to value all property every year. This particular type of lack of equalization between taxpayers has been held "permissible because caused by logistical problems which may be temporarily beyond the power of the city to correct." *District of Columbia v. Green, supra* at 856. We there concluded, in effect, that this logistical factor was not reasonably established.

5. The trial judge held that certification as a class action and notice to members of the class were unnecessary because the rules applicable to the Tax Division omitted any mention of class action procedures. We note that effective September 3, 1975, Super.Ct.

Civ.R. 23, 23–I and 23–II were incorporated by reference into the Tax Division rules, and purported class action tax suits are now subject to the same criteria with respect to prerequisites, maintainability, and notice as other civil suits. *See* Super.Ct.Tax R. 3.

6. Notices of tax assessments for fiscal year 1973 were sent out during the period from November 1, 1971 to March 1, 1972. April 2, 1972 was the last day to appeal to the Board of Equalization and Review for any tax assessment for fiscal year 1973. In September 1972 the first installment on property taxes for fiscal year 1973 was due, with the second and final installment due during the month of March 1973.

7. *See also, e. g., Snyderman v. Isaacs,* 31 Ill.2d 192, 201 N.E.2d 106 (1964); *People ex rel. City of Highland Park v. McKibbin,* 380 Ill. 447, 44 N.E.2d 449 (1942), *cert. de-*

appeal to the Superior Court requires, as a first step, a complaint to the Board of Equalization and Review.[8] Subject matter jurisdiction of the Superior Court does not attach until that prerequisite has been satisfied,[9] and a refund based on a final determination of the Superior Court presupposes that the taxpayer has complied with the procedure mandated by the legislature. If "aggrieved" for any reason, the taxpayer must appeal within the permitted time to the Board of Equalization and Review. D.C.Code 1973 § 47–709. This was not done in this case. The taxpayers failed to follow their administrative remedies for fiscal year 1973.

■ Appellees contend that the administrative remedies could not have been pursued by any of the taxpayers for fiscal year 1973 because of prior concealment of the "stair-step" plan by District officials. In *Green,* however, we noted that three petitioners "ascertained the existence of, and raised as an issue, the increased level of assessment of their properties" before the Board of Equalization and Review for fiscal year 1974. *District of Columbia v.*

*Green, supra* at 851. These taxpayers not only pursued their administrative remedies but in the process also discovered the now prohibited practice of applying different debasement factors to similarly situated taxpayers. Consequently, we cannot assume, as the trial court did in the case now before us, that a timely administrative challenge to the 1973 taxes for the purpose of obtaining refunds was unavailable or would have been fruitless. The 1973 taxpayers were just as aware as the 1974 taxpayers that their tax bills had been increased.

■ In *Green,* we agreed with the trial court that the circumstances there were extraordinary and, further, that it would be inequitable to allow those who had bypassed the Board to proceed immediately with the action for injunction while requiring those who had gone to the Board to wait until the expiration of the statutory period before proceeding. Our conclusion was: "The evidence of record supports the findings of the trial court and, as a consequence, it was not error to entertain the [complaint] for injunction." *District of*

---

*nied,* 318 U.S. 778, 63 S.Ct. 852, 87 L.Ed. 1147 (1943) ; *People ex rel. Eitel v. Lindheimer,* 371 Ill. 367, 21 N.E.2d 318, *appeal dismissed sub nom., Illinois ex rel. Eitel v. Toman,* 308 U.S. 505, 60 S.Ct. 111, 84 L.Ed. 432 (1939) ; *Drummond v. Maine Employment Security Comm'n,* 157 Me. 404, 173 A.2d 353 (1961) ; *Baltimore County v. Churchill, Ltd.,* 271 Md. 1, 313 A.2d 829, *appeal dismissed,* 417 U.S. 902, 94 S.Ct. 2594, 41 L.Ed.2d 407 (1974) ; *Comptroller of the Treasury v. Campanella,* 265 Md. 478, 290 A.2d 475 (1972) ; *Wasena Housing Corp. v. Levay,* 188 Md. 383, 52 A.2d 903 (1947) ; *Universal Film Exchanges, Inc. v. Board of Finance and Revenue,* 409 Pa. 180, 185 A.2d 542 (1962), *cert. denied,* 372 U.S. 958, 83 S.Ct. 1015, 10 L.Ed.2d 12 (1963) ; *Calvert Distillers Corp. v. Board of Finance and Revenue,* 376 Pa. 476, 103 A.2d 668 (1954).

8. D.C.Code 1973, § 47–709 reads in pertinent part:
    Any person aggrieved by any assessment, equalization or valuation made may within six months after October 1 of the year in which such assessment, equalization, or valuation is made, appeal from such assess-

ment, equalization, or valuation in the same manner and to the same extent as provided in sections 47–2403 and 47–2404 ; *Provided, however,* That such person shall have first made his complaint to the Board of Equalization and Review respecting such assessment as herein provided. . . .
This language is also codified in D.C.Code 1973, § 47–2405. The relevant portions of these code provisions were repealed effective June 30, 1975, and the above requirement is now found in D.C.Code 1975 Supp., § 47–646(i).
    D.C.Code 1973, § 47–2407 reads:
    Any sum finally determined by the Superior Court to have been erroneously paid by or collected from the taxpayer shall be refunded by the District to the taxpayer from its annual appropriation for refunding erroneously paid taxes in said District.

9. Payment in full of the tax due is also jurisdictional. *See, e. g., George Hyman Constr. Co. v. District of Columbia,* D.C.App., 315 A.2d 175 (1974) ; *District of Columbia v. Berenter,* 151 U.S.App.D.C. 196, 466 F.2d 367 (1972).

*Columbia v. Green, supra* at 853. Thus, we specifically limited our analysis to the context of the relief sought.[10] That is to say, we held only that the circumstances before the court were so extraordinary as to warrant a prohibitive writ restraining the practice for fiscal year 1974 and subsequent years. Appellees argue that we should extend this holding to the instant refund case for the prior fiscal year of 1973. We disagree and hold that equitable intervention is not justified in this case.[11]

▆▆ Moreover, even assuming it were appropriate to apply the principles of equity to the facts before us, we do not believe that appellees would be entitled to refunds. Regardless of the specific context involved, the distinguishing feature of equity jurisdiction is " . . . the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587 592, 88 L.Ed. 754 (1944). Thus, it is characteristic of a court of equity that it must take a comprehensive view of the issues before it; and as a result its extraordinary remedies are to be meted out with care. Where the public interest is involved,

[c]ourts of equity may, and frequently do, go much farther both to give *and withhold* relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. *Pennsylvania v. Williams,* 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841; *Central Kentucky Gas Co. v. Railroad Commission,* 290 U.S. 264, 270–273, 54 S.Ct. 154, 156, 157, 78 L.Ed. 307; *Harrisonville v. W. S. Dickey Clay Co.,* 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208; *Beasley v. Texas & Pacific Ry. Co.,* 191 U.S. 492, 497, 24 S.Ct. 164, 48 L.Ed. 274; *Joy v. St. Louis,* 138 U.S. 1, 47, 11 S.Ct. 243, 34 L.Ed. 843; *Texas & Pacific Ry. Co. v. Marshall,* 136 U.S. 393, 405–406, 10 S.Ct. 846, 34 L.Ed. 385; *Conger v. New York, W. S. & B. R. Co.,* 120 N.Y. 29, 32, 33, 23 N.E. 983. [*Virginian Ry. v. System Federation 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L. Ed. 789 (1937) (emphasis added). *See also United States v. First National City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L. Ed.2d 365 (1965) and cases cited therein at 383, 85 S.Ct. 528.]

▆▆ This principle was applied in *Blair v. Freeman,* 125 U.S.App.D.C. 207, 370 F. 2d 229 (1966) which involved a marketing regulation of the Secretary of Agriculture

10. *Tumulty v. District of Columbia,* 69 App. D.C. 390, 102 F.2d 254 (1939) was cited in *Green* for the proposition that when an assessment is void, resort to equity may be had without following statutory remedies. *District of Columbia v. Green, supra* at 853. *Tumulty,* however, involved the question of whether an invalid District of Columbia tax claim, filed in a receivership proceeding, could be attacked in that proceeding by parties with other claims against the company in receivership. The United States Court of Appeals held that equity would permit such a collateral attack on the tax claim. Hence, the relief sought and granted in *Tumulty* was preventive in nature (because it precluded assertion of the invalid tax claim) and therefore analogous to the injunctive relief sought and granted in *Green,* but not applicable to the refunds sought here.

11. We note that the fiscal year 1974 taxpayers who resorted to the Board of Equalization and Review and raised the issue of unequal debasement factors found the Board unresponsive to their arguments. Hence, in *Green,* where only injunctive relief was sought, we stated that a taxpayer in that case had "no meaningful ability to challenge his assessment at all" because the Board declined to inquire into the non-judgmental aspects of the assessment process. *District of Columbia v. Green, supra* at 856. This was one of the extraordinary circumstances upon which the grant of injunctive relief in *Green* was based. However, the fact that an administrative body may wrongly perceive the nature or scope of its powers or responsibilities in a given instance is not a justification for bypassing that body in all instances when it is an essential element in a procedure of purely statutory origin. In fact, it would be a rare instance when taxpayers would not bypass the Board at great peril.

who authorized premium payments to dairy farmers in certain locations. The payments were made from a settlement fund or equalization pool intended to apportion among producers the benefits and burdens of variations in the fluid milk market. One side effect of the Secretary's order was to reduce statutorily mandated uniform minimum prices received by other farmers not in the specified geographical areas; and this adversely affected group sought a declaratory judgment and an injunction restraining enforcement of the regulation. The trial court dismissed the complaint and the United States Court of Appeals reversed and granted declaratory and injunctive relief but excluded the possibility of refunds [12] for the following reason:

> Appellants have invoked the aid of equity in seeking a declaration of their rights and the prevention of further interference with them. We are concerned lest a declaration of invalidity in the context of such an action be deemed to require refund of moneys illegally paid and received under an invalid order. A court of equity may tailor its relief with a critical and balanced view of the ramifications of its decision, including in the overall public interest a consideration of the interests of those not before the court. [125 U.S.App.D.C. at 217, 370 F.2d at 239 (footnote omitted).]

In treating the refund issue, the court considered a variety of factors including the complexity of the recoupment and refund process, the large sums of money and

large number of farmers involved, the long delay in filing suit, the difficulty in determining if the plaintiffs had received offsetting advantages from other aspects of the equalization system, and the fact that the court was convinced that under all the circumstances "the producers benefited are not necessarily to be held to account for an ultra vires action taken by the Secretary in what he conceived to be the public interest." 125 U.S.App.D.C. at 217, 370 F.2d at 239 (footnote omitted).

We do not mean to say that these considerations are dispositive of the issue before us, or even that all are relevant to the case at hand. Rather, we recite them because they demonstrate the mode of analysis which should be applied by a court of equity in cases such as this.

Prospective application of judicial decisions is a practice often followed, particularly where retrospective operation of a decision would create economic hardship which would outweigh the beneficial effect of retroactivity.[13]

In *Southern Pacific Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963) (en banc) it was held that while real property taxes based on discriminatory assessments had been illegally collected from a taxpayer railroad, only prospective injunctive relief would be granted [14] because "[t]he refund which appellant seeks together with other similar claims threatens the financial solvency of many taxing units

---

12. The court recognized that litigation as to refunds was imminent because the appellants' interest in the settlement fund was sufficient to confer standing for such a suit and because the appellants had sought an order requiring an escrow pendente lite. 125 U.S.App.D.C. at 217 n. 39, 370 F.2d at 239 n. 39.

13. This doctrine is sometimes applied when a decision overrules prior law or regulation. *See, e. g., Safarik v. Udall*, 113 U.S.App. D.C. 68, 304 F.2d 944, *cert. denied*, 371 U.S. 901, 83 S.Ct. 206, 9 L.Ed.2d 164 (1962); *Arizona State Tax Comm'n v. Ensign*, 75 Ariz. 376, 257 P.2d 392 (1953); *State v. Martin*, 62 Wash.2d 645, 384 P.2d 833 (1963).

14. Unlike the situation here, the practices complained of in *Southern Pacific, supra*, had existed openly for many years with only perfunctory protests from the affected taxpayer. We do not believe, however, that the factual difference is a significant one. Although the Arizona Supreme Court was critical of the inaction on the part of the railroad in the face of long-standing discriminatory assessment, the refunds sought were for only one-half of one fiscal year (rather than for the entire period of discrimination) and the decision not to grant refunds was based on that demand, which "together with other similar claims" posed a threat to governmental stability.

of the state. . . ."[15] 92 Ariz. at 406, 377 P.2d at 778. Significantly, the court so held despite the fact that the taxpayer relied upon a statutory provision which allowed for refund of illegally collected taxes. On this point, the court said:

> The State's grace does not extend to its own destruction. Clearly this was not within the contemplation of the legislature in the enactment of the refunding statute. [92 Ariz. at 407, 377 P.2d at 778.]

In their presentations both here and in the trial court, appellees have stressed that the District's treatment of this matter, although perhaps well intentioned, was not characterized either by candor or adherence to principles of good fiscal management, but this does not justify the granting of refunds. However erroneous such practices have been found to be, they cannot, consistently with the objects of equity jurisprudence, be viewed in isolation or without regard to the practical consequences which the requested retrospective relief would have. This court is confronted with the task of attempting to reconcile competing claims to equity, these being the financial interest of the assumedly wronged appellees on the one hand, and the financial interest of the District of Columbia as it relates to all of the people whom it serves, on the other hand.[16]

Appellees represent to this court that an average of $41 per taxpayer is at stake here and that the aggregate refunds sought in this particular litigation would amount to from $1.1 million to $1.6 million.[17] Ap-

pellees state that the total refund amount would be insignificant in light of the District's budget of approximately $1 billion, and that the District's has recently foregone greater sums by voluntarily reducing the debasement factor applied to commercial property from 65% to 55%.

We do not agree. The sums at issue here are not insignificant by any realistic standard, whether absolute or relative; and this decision may be considered to have precedential effect in future class action tax refund cases.

The funds collected for fiscal year 1973 have already been disbursed for governmental purposes which have benefited all of the citizens of the District of Columbia and the refunds sought here would have to be financed through increased taxes or decreased services. It has been stated in a somewhat similar situation, that

> [a]s government is dependent on taxation for its maintenance, the local subdivision that levied the illegal or unconstitutional tax would have to tax the taxpayers to raise the necessary money to return to them the illegal or unconstitutional tax collected. In other words, the taxpayers would have to be paid the illegal tax, paid by them out of their own pockets. Such a ceremony would be idle and vain. [*Dupre v. City of Opelousas,* 161 La. 272, 276, 108 So. 479, 481 (1926).]

Thus, not only did the taxpayers not pursue the statutory procedures, but under these particular circumstances the adverse impact of refunds on the entire citizenry

---

15. Although refunds were not at issue, much the same considerations were taken into account by the three-judge district court in *Weissinger v. Boswell,* 330 F.Supp. 615 (M. D.Ala.1971). In that case, Alabama's ad valorem property tax program was held discriminatory and unconstitutional but expressing concern about the fiscal impact of its decision, the court allowed the Commissioner of Revenue up to one year from the date of its opinion to equalize assessments. *Id.* at 625.

16. Another implication of appellees' arguments has been that they seek by means of this suit to serve a general interest in good government by encouraging fairness and openness on the part of officials of the District. We believe, however, that this interest has been vindicated by the result in *Green.*

17. Appellees' estimates below were an average refund of approximately $50 per taxpayer, with some as little as $10 or less and a total of $1.5 to $1.75 million.

of the District outweighs the economic interest of the property owners who paid the taxes at issue.[18]

■ Appellees in this case have come to the courts seeking equity but equity has already been done by the first *Green* case, *supra,* where a mandatory injunction was affirmed despite this jurisdiction's anti-tax injunction statute. D.C.Code 1973, § 47–2410.[19] After a balancing of all interests in this case, we conclude that the public interest would be disserved by a grant of the refunds sought. In *Green,* we went as far as equity requires us to go and so we will not go further here.

■ While application of the principles of equity occasionally may be appropriate in tax litigation (*e. g., Green*) it would hardly aid the financial stability of this city if this court were to relax the statutory requirements of our Code as they relate to tax litigation and superimpose equity jurisprudence on these statutory requirements. This should be done only in a rare case (*e. g., Green*). Otherwise, financial instability would be promoted. Tax statutes are necessarily formalistic and often technical. It is essential that we adhere to their technicalities, even if at times a seeming hardship results to the taxpayer. *See, e. g., George Hyman Construction Co. v. District of Columbia,* D.C.App., 315 A. 2d 175, 178 (1974). Among other things, fiscal considerations require that this be done. Where class action tax refunds for fiscal years in the past are at issue, the relief sought would not emanate from some inexhaustible treasury. The reality is that the funds could only be supplied by an additional tax on innocent taxpayers,[20] or the reduction of services, in an already financially beleaguered city. Only in extraordinary circumstances, not here present, should the equity relief sought be afforded.

Accordingly, the judgment of the trial court is

*Reversed with instructions to dismiss the complaint.*

18. The second opinion of this court in *District of Columbia v. Green,* D.C.App., 348 A.2d 305 (1975) is not to the contrary. Our decision there was simply an implementation of the first *Green* case (310 A.2d 848 (1973)) and it did not run to tax refunds for a prior fiscal year.

19. D.C.Code 1973, § 47–2410: "No suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax."

Injunctive relief notwithstanding the existence of an antitax injunction statute is not entirely unprecedented, but it may be granted only in the most exceptional and stringent circumstances. *Bob Jones Univ. v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974); *Enochs v. Williams Packing and Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).

20. This would include taxpayers in the class here seeking relief.