DISTRICT OF COLUMBIA,
et al., Appellants,

v.

Peter S. CRAIG, et al., Appellees.

District of Columbia, et al., Appellants,

v.

Polly H. Ernst, et al., Appellees.

Nos. 06–TX–177, 06–TX–178.

District of Columbia Court of Appeals.

Argued Jan. 12, 2007.

Decided July 19, 2007.

not challenged the trial court's denial of his motion. In this latest effort, counsel relies on a July 15, 2005 "Determination and Undertaking" of the District of Columbia Disabilities and Tenure Commission that the trial judge's conduct during a traffic stop on March 6, 2005 "fairly gave the appearance of an attempt to lend the prestige of her office to advance her private interests, that is, to gain the personal advantage of deferential treatment, and that her conduct was of a sort that erodes public confidence in the judiciary." According to the Commission, the trial judge made comments to the police officers who stopped her "which were reasonably understood to suggest that, as a judge, she was entitled to 'professional courtesy' from the police." The Commission noted that the trial judge had "accept[ed] the Commission's determinations and conclusions ..., recognize[d] that her conduct in this instance had the regrettable impact ... and violated the applicable provision of the Code of Judicial Conduct." The Commission imposed no sanction, however, in view of the trial judge's "record of integrity and exemplary judicial service on behalf of the people of the District of Columbia over some twenty-one years."

Counsel's argument seems to be that a reasonable observer could conclude that in her

rulings in this case the trial judge returned the "professional courtesy" to the police. The "objective observer" standard, however, implies the observer's knowledge of relevant facts—not speculation or simply cynicism—giving rise to "an appearance of bias or prejudice sufficient to permit the average citizen *reasonably* to question [the] judge's impartiality." *York v. United States*, 785 A.2d 651, 655 (D.C.2001) (emphasis added). Even assuming appellant's premise that the Commission's determination suggests that the trial judge was favorably disposed to the police, trial in this case preceded the incident underlying the Commission's determination by five years. But we reject the premise of bias altogether. The extensive record in this case reveals that the trial judge gave careful consideration to the evidentiary issues and struggled during extensive and intensive conversations with counsel in considering the motion for judgment as a matter of law. She was fully aware of the terrible events that had transpired and of the difficulty appellant faced in proving what happened when her son was shot. As we discuss in this opinion, her rulings were based on the law and the evidence, and it is for that reason that we affirm the judgment on appeal.

Mary L. Wilson, Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Eugene A. Adams, Interim Attorney General at the time the reply brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, were on the brief for appellants.

Peter S. Craig, with whom Nathalie V. Black, Stephen M. Truitt and Stephen B.

Ives, Jr. were on the brief, for appellees in 06–TX–177.

Gilbert Hahn, Jr. for appellees in 06–TX–178.

John M. Goodman filed a brief for amicus curiae Federation of Citizens Associations of the District of Columbia.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and KERN, Senior Judge.

THOMPSON, Associate Judge:

These consolidated appeals are from decisions of the Superior Court Tax Division (the "Tax Division") in two certified class actions in which the court entered summary judgment against respondents/appellants the District of Columbia and several District officials (together, "the District").[1] In Case No. 06–TX–177, petitioner/appellee Peter Craig sued on behalf of a class of taxpayers owning Class 1 (*i.e.*, residential) properties in a section of the District designated for real property tax purposes as Triennial Group I, to invalidate the District's real property tax assessments for tax year 2002. As relief, Craig asked the Tax Division to "find that the assessments . . . of Class 1 properties in former Triennial Group I, made in 2001 for Tax Year 2002 . . . are arbitrary, capricious and contrary to law and the Constitution and are hence void," to order the District to "reinstate the assessments effective for Tax Year 2001," and to "refund for Tax Year 2002 to each [class] member . . . the difference . . . between the taxes paid on the assessments voided herein" and the 2001 tax assessment. In Case No. 06–TX–178, petitioners Polly Ernst and Margot Hahn brought a similar action on behalf of a "class in formation," challenging assessments for tax years 2002 and 2003, which suit the Tax Division consolidated with *Craig* as to claims regarding tax year 2002 assessments.[2]

On September 23, 2005, the Tax Division entered an order in *Craig* concluding that "the assessments made by [the District] for Class 1 residential properties in Triennial Group I for Tax Year 2002 are arbitrary, capricious, and [an] abuse of discretion, and otherwise not in conformity with the Constitution of the United States or the law of the District of Columbia, and are, therefore, void." The court ordered the District to "make refunds . . . to all owners of Class 1 residential properties in Triennial Group I who were finally assessed at a higher level in tax year 2002 than in tax year 2001 and who paid taxes on such higher assessment." On November 10, 2005, the court ordered similar relief in the consolidated portion of *Ernst*.

The District appellants contend that the Tax Division lacked jurisdiction to entertain the class action suits and to award the declaratory and injunctive relief that it ordered. The District also urges that, even assuming that the Tax Division had jurisdiction, the court erred in granting summary judgment to the petitioners/appellees. We agree, and therefore vacate the class certification order and injunction,

---

1. Respondents/appellants are the District of Columbia and the following District officials: the Mayor, the Chief Financial Officer of the District of Columbia, the Deputy Chief Financial Officer of the District of Columbia for the Office of Tax and Revenue, the Director of Real Property Tax Administration, the Chief Assessor of the Office of Tax and Revenue, and the Chair of the Board of Real Property Assessments and Appeals.

2. Although informed that Ernst and Hahn owned no property in Triennial Group I, the only Triennial Group reassessed for tax year 2002, the court allowed the petitioners' tax year 2002 challenge to proceed. The court stayed proceedings as to the claims in *Ernst* that were not consolidated with *Craig, i.e.,* the claims challenging tax year 2003 assessments.

reverse the Tax Division's summary judgment ruling, and remand.

## I. Factual and Procedural Background

The primary objective of real property taxation in the District of Columbia is to ensure "[e]quitable sharing of the financial burden of the government. . . ." D.C.Code § 47–801(1). Under the statutory scheme, a rate of taxation established by the D.C. Council is applied to the "assessed value" of all real property subject to taxation. D.C.Code § 47–812(a). The dispute in these appeals relates to the methodology that the District used to arrive at the assessed value of so-called Triennial Group I residential properties for tax year 2002.

D.C.Code § 47–820(a)(3) provides that the "assessed value for all real property shall be the estimated market value of such property" on the relevant date, "as determined by the Mayor." "Estimated market value" is defined as "the most probable price at which a particular piece of real property . . . would be expected to transfer under prevailing market conditions" between parties dealing at arm's length. D.C.Code § 47–802(4). The Mayor may make assessments "manually or through the use of an automated system or systems such as the Computer–Assisted Mass Appraisal System," D.C.Code § 47–820(a)(3), and is required annually to compile an estimated assessment roll listing the assessed value of all real property as of the valuation date. See D.C.Code § 47–820(a)(1). Estimated assessments are subject to appeal under D.C.Code § 47–825.01(f–1), which provides for a first-level administrative review (to the Office of Tax and Revenue, "OTR") (see D.C.Code § 47–825.01(f–1)(1)(A) & (B)), which review may be followed by an appeal to the Board of Real Property Assessments and Appeals ("BRPAA") (see D.C.Code § 47–825.01(f–1)(2)) and thereafter to the Superior Court. See D.C.Code § 47–825.01(j–1). The Tax Division has exclusive jurisdiction of "all appeals from and petitions for review of assessments of tax . . . made by the District of Columbia." D.C.Code § 11–1201(1).

Beginning in tax year 1999, the District began a triennial assessment system under which (subject to certain exceptions) all real property was assessed at least once every three years. See D.C.Code § 47–820(b–1)(1). Under the short-lived triennial system, each lot was assigned to one of three "Triennial Groups." For Triennial Group I, the assessed value for tax year 1999, based on valuation as of January 1, 1998, remained in effect for tax years 2000 and 2001 as well.[3] Beginning with tax year 2002, each property that had completed a three-year cycle was returned to annual revaluation. See D.C.Code § 47–820(b–2). Accordingly, Class 1 properties in Triennial Group I (including the property of petitioner/appellee Craig and the certified class he represents) were reassessed for tax year 2002, based on valuation as of January 1, 2001.[4]

To determine proposed assessments for Triennial Group I residential properties (other than condominiums) for tax year 2002, OTR developed an across-the-board multiplier for each neighborhood or sub-neighborhood (the "neighborhood multiplier"). Each property's proposed assessment for tax year 2002 was the product of the applicable neighborhood multiplier and

---

**3.** Similarly, for Triennial Group II, the assessed value for tax year 2000, based on valuation as of January 1, 1999, remained in effect for tax years 2001 and 2002. For Triennial Group III, the assessed value for tax year 2001, based on valuation as of January 1, 2000, remained in effect for tax years 2002 and 2003.

**4.** See D.C.Code § 47–813(c)(1) (definition of "Class 1 Property").

the property's prior (tax year 1999) assessed value. The dispute before us pertains to the methodology by which OTR developed the neighborhood multipliers.

Roughly described, the methodology entailed identifying properties in each Triennial Group I neighborhood that sold during calendar year 1999 or 2000; determining a ratio of each such property's tax year 1999 assessed value to the property's calendar year 1999 or 2000 sales price (the property's "assessment-sales ratio"); arraying the ratios from lowest to highest and identifying the median; expressing the reciprocal of the median ratio; designating the reciprocal as the neighborhood multiplier; and applying the neighborhood multiplier to the previous assessed value of each property. OTR Director Henry Riley explained that the foregoing methodology, which OTR refers to as a "trending methodology," was intended to capture the steady growth in value in the District real estate market. According to Mr. Riley, the methodology was an efficient application of OTR's limited resources and manpower to ascertain market value.

Using the trending methodology, OTR applied a multiplier of 1.492 to the previous assessed value of each residential property in the District neighborhood known as Cleveland Park to arrive at proposed tax year 2002 assessments. As a result, appellee Craig's tax year 1999 assessment of $401,529 for his property at 3406 Macomb Street, N.W., was multiplied by 1.492 to reach a proposed tax year 2002 assessment of $599,081. Neighborhood multipliers for neighborhoods in Triennial Group I ranged from the high of 1.492 for Cleveland Park to a low of .973 for Congress Heights.

On April 27, 2001, OTR mailed notices of the proposed tax year 2002 assessments to Triennial Group I property owners. Responding to the notice he received, petitioner Craig requested that OTR administratively review his proposed assessment. After OTR declined to reduce the assessment, Craig appealed to the BRPAA, contending that the proposed assessment exceeded his property's market value and also that OTR's trending methodology created systemic errors—*i.e.*, resulted in some properties being over-assessed and others being under-assessed—thereby, Craig argued, violating both District law and the United States Constitution. Asserting that there had been no material improvements to his property since 1957 and that his house had interior damage because of a leaky roof, Craig asked the BRPAA to roll back his own assessment from the proposed assessed value of $599,081 to the prior assessed level of $401,529, or at least to his property's actual market value, which Craig claimed was $460,537. He also asked the BRPAA to roll back the assessments for all residential properties in Cleveland Park to their previous assessment levels unless and until the District made new "lawful" assessments. A number of other Cleveland Park residential property owners also filed appeals with OTR and then the BRPAA. The BRPAA held a hearing on common issues.[5]

The BRPAA concluded that the District's assessment methodology was consistent with the broad discretion given the Mayor and Deputy Chief Financial Officer by the governing statute and regulations, but that the methodology had produced a flawed result as to Craig's property. The BRPAA therefore decreased Craig's assessment to $513,000. Craig then filed suit in the Tax Division, seeking to set

---

5. The record indicates that, District-wide, owners of 1,259 residential properties submitted first-level appeals of their tax year 2002 assessments. Approximately 129 assessments were further appealed to the BRPAA.

aside the tax year 2002 assessments for properties in Triennial Group I, including properties whose owners had not sought administrative review of their proposed assessments. Craig sued on behalf of himself, the named owners of forty-three other properties in Triennial Group I, and a class of other property owners, all of whom he asserted had paid all taxes that had been billed. The petition asked the court "to set aside and correct unlawful and unconstitutional real property tax assessments levied" on residential properties in Triennial Group I for tax year 2002 and to order the District to refund the overpayment amounts. The Ernst petition sought similar relief.

The District moved to dismiss the petitions for lack of jurisdiction, except as to the named petitioners who had satisfied the statutory jurisdictional prerequisites for appeal to the Superior Court by pursuing individual appeals to OTR and the BRPAA. The District also opposed certification of the petitions as class actions and sought to require any qualifying named petitioners to litigate their cases separately.

The Tax Division denied the District's motions to dismiss as to any petitioners who had not appealed to the BRPAA, declined to sever the case into individual proceedings and certified a class described as follows:

> [T]he owners of Class 1 residential real properties located in the District of Columbia in neighborhoods encompassed in former Triennial Group 1, as defined by the Office of Tax and Revenue of the District of Columbia, with respect to real property assessments and taxes levied for tax year 2002, where such taxes and all penalties have been previously paid.... Such class *includes only those real property owners who were adversely* affected by the use of the alleged unlawful assessment methodology.

June 11, 2003 Memorandum Order (underscoring in the original). The court's certification order states that the class consists of approximately 35,000 persons.

Thereafter, the court denied the District's motion for summary judgment and granted judgment to appellees as to the tax year 2002 assessments. The court held that the District's assessment method for TY 2002 resulted in "widespread discrimination, generally in favor of more expensive property to the detriment of middle-priced and low-prices [sic] residential properties [and the] Respondents knew or should have known of this discrimination, but willfully, knowingly, intentionally and deliberately used this process to determine TY 2002 real property tax assessment[s] for Triennial Group 1 residential properties." The court also ruled that trending "should have been subject to rulemaking under the DCAPA [District of Columbia Administrative Procedure Act]." The court further concluded that the District's tax year 2002 assessment notices "intentionally and deliberately failed to comply with the requirements of the D.C.Code" and the "elementary rights of due process under the Constitution ... depriving taxpayers of information necessary to exercise [the] right of appeal." The court issued a final order granting a refund, with interest, to each class member who suffered a tax increase resulting from the across-the-board adjustments in assessments for tax year 2002. The court stayed its order pending these appeals.

## II. Analysis

### A. The Action on Behalf of Taxpayers Who Had Not Pursued Their Administrative Remedies, and the Relief That the Court Awarded, Violated the District's Anti–Injunction Act.

■ "[T]axes are the life-blood of government, and their prompt and certain

availability an imperious need." *Bull v. United States,* 295 U.S. 247, 259, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). This principle is reflected in the District of Columbia Anti–Injunction Act, D.C.Code § 47–3307,[6] which provides that "[n]o suit shall be filed to enjoin the assessment or collection by the District of Columbia or any of its officers, agents, or employees of any tax." Our case law establishes that the Anti–Injunction Act prohibition "precludes declaratory as well as injunctive relief." *District of Columbia v. United Jewish Appeal Fed'n, supra* note 6, 672 A.2d at 1079; *see also Barry v. Am. Tel. & Tel. Co.,* 563 A.2d 1069, 1073 (D.C.1989). To state this limitation in the affirmative, the Anti–Injunction Act requires that "the determination of the legality of [a] tax [ ] be deter-

mined in a refund suit." *Tolu v. District of Columbia,* 906 A.2d 265, 267 (D.C.2006). Outside the context of a tax refund suit, a plaintiff seeking declaratory or injunctive relief from a tax assessment can avoid the Anti–Injunction Act bar only by showing that two criteria are met: that there is no adequate legal remedy, and that "'under no circumstances could the Government ultimately prevail.'" *Id.* at 267 (quoting *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962)).[7]

Both the Craig and Ernst petitioners' prayers for relief and the class-wide relief that the Tax Division awarded leave no question that the petitions were suits for declaratory and injunctive relief within the meaning of the Anti–Injunction Act. Ac-

---

**6.** *See District of Columbia v. United Jewish Appeal Fed'n,* 672 A.2d 1075, 1082 (D.C.1996) (Farrell, J., concurring).

**7.** Because the District's Anti–Injunction Act is "very similar" to the federal Anti–Injunction Act, 26 U.S.C. § 7421(a) (providing that "[n]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed"), we have said that federal court decisions interpreting and applying section 7421(a) are "persuasive when construing our own law." *United Jewish Appeal Fed'n,* 672 A.2d at 1079 n. 3 (citing *Barry,* 563 A.2d at 1073–76). We also rely on decisions applying the jurisdictional bar of the federal Tax Injunction Act, 28 U.S.C. § 1341 (which bars federal district courts from restraining the assessment of any tax under state law where the state affords a "plain, speedy and efficient remedy"), as persuasive authority for determining the scope of the District Anti–Injunction Act. *See Barry,* 563 A.2d at 1074; *see also McCrory Corp. v. Ohio,* 212 B.R. 229 (S.D.N.Y.1997) (the federal Anti–Injunction Act and the federal Tax Injunction Act "should be interpreted in a harmonious manner.").

Like the District's Anti–Injunction Act, the federal Anti–Injunction statute "'require[s] that the legal right to the disputed sums be

determined in a suit for refund.'" *Davis v. United States,* No. 05–2474, 2006 WL 2687018, *5, 2006 U.S. Dist. LEXIS 66627, *13–14 (D.D.C. Sept. 19, 2006) (quoting *Hibbs v. Winn,* 542 U.S. 88, 103, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004)). "The United States Supreme Court has given an almost literal reading to the [federal Anti–Injunction] Act in depriving courts of subject matter jurisdiction over suits to enjoin *any aspect* of IRS activity involving the assessment or collection of federal taxes." *Smith v. United States,* No. 98–0139, 1999 WL 33318819, *1, 1999 U.S. Dist. LEXIS 3997, *4 (D.Ariz. March 12, 1999) (emphasis added). "The thrust of the Act is to prevent a taxpayer from bypassing adequate administrative and judicial forums...." *Graham v. United States,* 528 F.Supp. 933, 938 (E.D.Pa.1981); *see also Universal Life Church, Inc. v. IRS,* No. 81–112, 1981 WL 1954, *2, 1981 U.S. Dist. LEXIS 17551, *5–6 (D.Cal. Dec. 4, 1981) ("Congress has historically taken great pains to create specific procedures to govern the judicial review of federal tax controversies. This is so because efficient and expeditious tax administration is the vital lifeblood of the national government. The restrictions that Congress has placed on the courts' role in the taxing system proves that it did not intend them to entertain challenges to the tax system which fall without the parameters defined by statute.").

cordingly, the Tax Division was without jurisdiction to entertain the petitions unless the suits were tax refund suits, or unless the suits satisfied the two criteria for an exception to the Anti–Injunction Act.

### 1. As to Most Members of the Certified Class, The Petitions Were Not Refund Suits.

■ The Tax Division was careful to limit class membership to property owners who had paid their tax year 2002 taxes and were seeking court-ordered refunds. In that sense, these class actions were suits for refunds. We hold, however, that as to most members of the certified class, the suits were not actually "refund suits," because the jurisdictional requirements for filing a refund suit were not met.

■ It has long been established that "[r]ecovery of taxes illegally or erroneously assessed and voluntarily paid was not permitted at common law and is a matter within the purview of the legislative branch. Therefore, refunds of taxes so assessed and paid will not be made absent an authorizing statute." *District of Columbia v. Keyes,* 362 A.2d 729, 732 (D.C. 1976) (citing *District of Columbia v. McFall,* 88 U.S.App. D.C. 217, 188 F.2d 991 (1951)); *Lindner v. District of Columbia,* 32 A.2d 540, 542–43 (D.C.1943). Simply put, to maintain a refund suit, a taxpayer must follow the specific, statutorily-prescribed procedures governing such suits. *Keyes,* 362 A.2d at 737; *see also Kleiboemer v. District of Columbia,* 458 A.2d 731, 734 (D.C.1983). It is D.C.Code §§ 47–825.01(f–1) and (j–1) that establish

how actions to obtain refunds of District real property taxes may be brought. These sections provide for a petition to OTR for administrative review, *see* D.C.Code § 47–825.01(f–1)(1)(A); for an "owner ... aggrieved by a notice of final [OTR] determination on a petition for administrative review" to "appeal from the proposed assessed value ... with the [BRPAA] within 30 days from the date of the notice of final determination" (D.C.Code § 47–825.01(f–1)(2));[8] and for "an owner aggrieved by a proposed assessed value ... [to] appeal the proposed assessed value ... to the Superior Court of the District of Columbia in the same manner and to the same extent as provided in § [ ] 47–3303 ... *provided, that (1) the owner shall have first appealed in good faith the assessed value ... to the [BRPAA]* immediately preceding the appeal to the Superior Court...." D.C.Code § 47–3303 provides for appeals by "[a]ny person aggrieved by any assessment" to the Superior Court, "provided, that such person shall first pay such tax together with penalties and interest due thereon to the D.C. Treasurer." D.C.Code § 47–825.01(j–1) (italics added). Thus, only after a property owner has appealed to the BRPAA and paid her taxes may she petition the Superior Court Tax Division for review and for a tax refund. A property owner's prior resort to the statutorily-prescribed administrative review procedure for seeking a property tax refund is "an essential element in a procedure of purely statutory origin." *Keyes,* 362 A.2d at 734 n. 11. "Subject matter jurisdiction of the Superior Court does not attach until that [administrative review] prerequisite has been satisfied...." *Id.* at 733.[9]

---

8. *See also* D.C.Code § 47–825.01(f–1)(3) ("Unless otherwise provided in this section, a good faith petition for an administrative review shall be a prerequisite for filing an appeal from a proposed assessed value or classification with the [BRPAA].").

9. Similar principles apply to suits in the federal courts for refunds of federal taxes. *See, e.g., Culpepper–Smith v. United States,* No. 96–5855, 1998 WL 544964, *7, 1998 U.S. Dist. LEXIS 13220, *23 (E.D.Pa. Aug. 24, 1998) ("Plaintiff's failure to file a timely administrative claim with the IRS deprives the court of jurisdiction over any tax refund suit by

The Tax Division certified a class of all property owners in Triennial Group I who were adversely affected by their tax year 2002 real property assessments and who had paid their taxes, without requiring that each class member also have pursued his or her administrative remedies through an initial filing with OTR and an appeal to the BRPAA. This was error, because members of the purported class who did not utilize the statutorily-prescribed administrative process were without a statutory right to participate in a refund suit.

Attempting to avoid this conclusion, appellees argue that "[w]here an administrative appeal would be futile, as here, the exhaustion rule does not apply." They also assert that it would have been impractical for all 35,000 class members to pursue the administrative process.[10] In addition, they argue that requiring all class members to have pursued their administrative remedies contravenes the legislative intent that the Superior Court permit real property tax class-action suits.[11] It is enough to meet the jurisdictional prerequisites for a refund suit, appellee Craig contends, that he as class representative exhausted his administrative remedies. We reject all three arguments.

The first argument appears to confuse the judicial doctrine of administrative exhaustion with what the United States Court of Appeals for the District of Columbia Circuit has called "jurisdictional exhaustion." As that court recently observed,

> The word "exhaustion" now describes two distinct legal concepts. The first is a judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court.... The second form of exhaustion arises when Congress requires resort to the administrative process as a predicate to judicial review. This "jurisdictional exhaustion" is rooted, not in prudential principles, but in Congress' power to control the jurisdiction of the federal courts.

*Avocados Plus Inc. v. Veneman*, 361 U.S.App. D.C. 519, 523–24, 370 F.3d 1243, 1247–48 (2004) (citing *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000)); *see also Davis v. United States, supra* n. 7, 2006 WL 2687018 at *6, 2006 U.S. Dist. LEXIS 66627 at *18 (" 'Non-jurisdictional exhaustion' is a 'judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court.' ... 'Jurisdictional exhaustion,' however, occurs when Congress uses its

her...."); *United States v. Cerro*, No. 92–2364, 1993 WL 410716, *2–3, 1993 U.S.App. LEXIS 27258, *8–9 (7th Cir. Oct. 14, 1993) (reasoning that where the taxpayer failed to overcome the bar of the federal Anti-Injunction Act, the only remedy available was an action for a refund, and upholding dismissal of the taxpayer's suit because the taxpayer had not filed the requisite administrative claim and thus failed to invoke the jurisdiction of the district court for purposes of a refund suit).

10. We discuss *infra* appellees' argument that individuals are not required to exhaust administrative remedies prior to filing suit under 42 U.S.C. § 1983.

11. *See* D.C.Code § 47–827 ("Within 1 year after September 3, 1974, the Superior Court of the District of Columbia shall establish a method which it deems appropriate by which class action cases regarding any matter relating to real and personal property taxes may be brought before the Superior Court."); *see also* Super. Ct. Tax R. 3 (providing that Super. Ct. Civ. R. 23 (establishing procedures for determining whether an action may be maintained as a class action), 23–I, and 23.2 are applicable to actions brought in the Tax Division).

power to control the jurisdiction of the federal courts through administrative requirements." (internal citations omitted)); *Erwin v. United States,* No. 05–1598, 2006 WL 2660296, *13, 2006 U.S. Dist. LEXIS 66049, *45–47 (D.D.C. Sept. 15, 2006) (reasoning, in response to plaintiffs' argument that the required administrative process was virtually certain to prove futile, that although "courts sometimes relieve plaintiffs of exhaustion requirements, ... this decision is generally only possible when the exhaustion requirement is itself a judicial creation.... By contrast, when exhaustion is mandated by statute, courts are not free to carve out exceptions that are not supported by the text" (internal citations omitted)); *see also Plaza Hollister Ltd. P'ship v. County of San Benito,* 72 Cal.App.4th 1, 84 Cal.Rptr.2d 715, 738 (1999) ("[T]he judicially developed doctrine of exhaustion of administrative remedies is distinct from statutorily prescribed jurisdictional prerequisites to statutory causes of action. Where the Legislature has imposed such jurisdictional prerequisites but those preconditions have not been met, a court is without power to grant relief.").

■ The general principle that may be derived from the foregoing cases is that "[i]f the statute does mandate exhaustion, a court cannot excuse it." *Avocados Plus,* 361 U.S.App.D.C. at 523, 370 F.3d at 1247. Here, the governing statute, D.C.Code § 47–825.01(j–l), mandates use of administrative remedies as a jurisdictional prerequisite. *See* D.C.Code § 47–825.01(j–l) ("[T]he owner shall have first appealed in good faith the assessed value or classifica-

tion to the [BRPAA] immediately preceding the appeal to the Superior Court...."). Accordingly, what appellees perceive as the futility or impracticability of review by the BRPAA did not provide a basis upon which the Tax Division could ignore statutory limitations and lawfully exercise jurisdiction over a tax refund suit on behalf of class members who did not first pursue administrative relief. *See Kleiboemer,* 458 A.2d at 734 ("Tax statutes are necessarily formalistic and often technical. It is essential that we adhere to their technicalities, even if at times a seeming hardship results to the taxpayer." (internal citation and quotation omitted)); *cf. Heckler v. Ringer,* 466 U.S. 602, 627, 627 n. 14, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (noting that "[i]n 1982 there were 48 million claims filed under Part A of the Medicare Program," but nevertheless reinstating dismissal for lack of jurisdiction over claims by plaintiffs who had failed to pursue administrative appeals before filing suit to challenge a Medicare payment policy, reasoning that "[i]n the best of all worlds, immediate judicial access for all of these parties might be desirable. But Congress, in [42 U.S.C.] § 405(g) and § 405(h), struck a different balance, refusing declaratory relief and requiring that administrative remedies be exhausted before judicial review of the Secretary's decisions takes place").[12]

Adherence to the statutory prerequisites for Superior Court jurisdiction over property tax refund suits does not conflict with the statutory mandate that the Superior Court permit property tax class actions.[13]

---

12. In *Ringer,* 466 U.S. at 627, 104 S.Ct. 2013, the Supreme Court observed further:
 Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims every year. If the bal-

ance is to be struck anew, the decision must come from Congress and not from this Court.

13. We note that our jurisdiction is not the only one that requires that all members of a taxpayer class exhaust their statutorily-created administrative remedies before maintaining a class-action refund suit. *See Hoffman v.*

As we observed in *Kleiboemer*,

> at the time Congress directed the Superior Court to adopt class action rules for tax cases, the federal courts consistently held that the filing of an administrative claim was a prerequisite to recover refunds.... There is no reason to believe that Congress intended a different rule for the District of Columbia.

458 A.2d at 733 n. 2; *see also Smith v. Murphy*, 294 A.2d 357, 360 (D.C.1972) ("[A]ssertion of class relief cannot vest jurisdiction where it does not otherwise exist."). Although in *Kleiboemer* we addressed a different provision of the District's tax code, our reasoning there applies equally in the instant cases: "[W]e cannot agree either with appellants' argument that, even if an administrative claim must be filed, the claim for refund filed by appellant ... on behalf of the entire class satisfies the [statutory] requirements.... The statute plainly states that the claim must be filed 'by the taxpayer.'" 458 A.2d at 734 n. 4. Requests for administrative review of proposed assessments of residential property and appeals

of the same to the BRPAA and the Tax Division likewise are permitted only for the owner/taxpayer. *See* D.C.Code § 47–802(5) (common definition of "owner" and "taxpayer"); D.C.Code §§ 47–825.01(f–1)(1)(A), and (2) and (j–1) (prescribing administrative review process available to an "owner"); *see also* D.C.Code § 47–825.01(e) ("[A]ny taxpayer may, on behalf of the general public of the District, appeal to the [BRPAA] the assessment of any real property *except Class 1* [*i.e.*, residential] *Property* " (italics added)). The Tax Division rule permitting taxpayer class actions is not superfluous, as it may be fully utilized by a class of taxpayers all of whom have satisfied the administrative prerequisites to filing suit with respect to their own Class 1 properties (provided they otherwise meet the criteria making class treatment appropriate).

In sum, as to most members of the class that the Tax Division certified in these cases, the jurisdictional prerequisites for allowing the taxpayers to bring refund suits to challenge their tax year 2002 real property assessments were neither satisfied nor excused.[14] Accordingly, the class

---

*Colo. State Bd. of Assessment Apps.*, 683 P.2d 783, 787 (Colo.1984) (reversing trial court decision allowing class action to proceed without requiring members of the class other than named plaintiffs to exhaust statutorily-prescribed administrative remedies); *Ziegler v. Ind. Dep't of State Rev.*, 797 N.E.2d 881, 886 (Ind.Tax2003) (noting that taxpayers were required to have filed timely administrative claims for refunds before maintaining a class action, although they need not have received final administrative determinations before filing suit); *but see Ariz. Dep't of Rev. v. Dougherty*, 200 Ariz. 515, 29 P.3d 862, 866 (2001) (class action could be maintained even where some class members had not pursued administrative remedies, because statute did not require that refund claims be filed by the taxpayer).

14. Appellees urge us to follow *District of Columbia v. Green*, 310 A.2d 848 (D.C.1973), a case in which the Tax Division reached the merits in a class action suit challenging real property tax assessments even though only

three of the petitioners had pursued administrative appeals. However, as we intimated in *Green* and also explained in later decisions, *Green* is of limited precedential value. First, we noted in *Green* that the "jurisdictional points [were] not pressed with vigor ..., each of the parties preferring a decision on the merits." *Id.* at 852; *see also District of Columbia v. Eastern Trans–Waste of Md., Inc.*, 758 A.2d 1, 13–14 n. 24 (D.C.2000) (in "the rarest of combined circumstances" the District can waive the Anti–Injunction Act jurisdictional bar). In the instant case, by contrast, from the outset the District has invoked the Anti–Injunction Act jurisdictional bar; no one suggests that there has been a waiver.

Second, in *Green* we observed that the District's argument as to the Anti–Injunction Act bar (then codified at D.C.Code § 47–2410) "would be readily accepted except that the trial court found the facts of this case to be so exceptional and extraordinary as to merit equitable relief ..." (citing *Miller v. Standard Nut Margarine Co.*, 284 U.S. 498, 509, 52

action was barred under the Anti–Injunction Act statute unless, at the time these petitions were filed, the District had no possibility of prevailing and the taxpayers had no adequate legal remedy. *See Keyes,* 362 A.2d at 732–33.[15] As we explain below, this two-pronged test was not satisfied.

## 2. In Denying the District's Motion to Dismiss for Lack of Jurisdiction, the Tax Division Did Not Find That the District Was Without a Possibility of Prevailing.

■ Under the strictures of the Anti–Injunction Act, the Superior Court must dismiss a suit seeking declaratory or injunctive relief with respect to a tax assessment unless the court finds that the District has no possibility of prevailing. That determination must be made as of the time the suit was filed. *See Barry,* 563 A.2d at 1076 ("[W]e will not look to the outcome below in determining whether the [taxed entities] have met their burden under the first prong"); *see also Inv. Annuity, Inc. v. Blumenthal,* 197 U.S.App. D.C. 235, 239, 609 F.2d 1, 5 (1979) (in light of federal Anti–Injunction statute, ordering dismissal of suit where taxpayer failed to meet its "burden of demonstrating that, at the time suit was commenced, the government could 'under no circumstances' ultimately prevail'"); *Prof'l Eng'rs, Inc. v. United States,* 527 F.2d 597, 600 (4th Cir.1975) (Anti–Injunction statute barred suit unless

S.Ct. 260, 76 L.Ed. 422 (1932)). But, as we noted last year in *Tolu,* in *Green* we failed to take into account the Supreme Court's decision in *Williams Packing:* "In *Williams Packing,* the court concluded that not only must a plaintiff seeking an injunction [despite the Anti–Injunction Act] show the inadequacy of a legal remedy, he must also show that 'under no circumstances could the Government ultimately prevail.'" *Tolu,* 906 A.2d at 267 (quoting *Williams Packing,* 370 U.S. at 7, 82 S.Ct. 1125).

15. Craig argues, incorrectly, that *Keyes* was overruled in *District of Columbia v. Burlington Apartment House Co.,* 375 A.2d 1052, 1057 (D.C.1977). In *Burlington,* we upheld a Tax Division order directing that a court-revised assessment for tax year 1973 would remain in place for tax year 1974. The case does *not* stand for the proposition that a taxpayer may sometimes bypass the administrative review process in seeking a tax refund. Quite the contrary. As we explained in *Burlington,* it was through resort to the administrative review process that

> Burlington contested the entire valuation process, not merely a single tax payment. The term "valuation" entails more than a finite amount of money for a particular year. It encompasses the deliberative process of an administrative body culminating in a computation which has a legal effect beyond any one year, at least until the pro-

cess is undertaken again in a subsequent year. It was this whole administrative course of conduct, its ultimate determination, and its binding effect—both presently and prospectively—from which Burlington requested relief and over which the trial court had jurisdiction. The court found that the valuation had been arbitrarily computed, and that it therefore was not legally usable as a basis for taxation. Under these circumstances, Rule 54(c) compelled the trial court's accommodation of Burlington for years following 1973—until a new valuation was made.

*Id.* at 1057. Moreover, our statement in *Burlington* that appellees emphasize, *i.e.,* that "[u]nder certain circumstances, the taxpayer first must complain to the Board ... before seeking relief in the trial court," *id.* at 1056, reflected the fact that under the 'D.C.Code provisions then in effect, property owners explicitly were permitted to bring suit directly in the Superior Court, without first having "made [a] complaint to the Board," where they had not received timely notice of an increased assessment. Pub.L. No. 93–407, § 426(i), 88 Stat. 1056 (Sept. 3, 1974) ("[I]n any case where no notice in writing of such increase of valuation was given the taxpayer prior to March 15 of the particular year, no such complaint [to the Board] shall be required for appeal") (repealed, D.C. Law 12–40, § 101(f), 44 D.C.Reg. 4859 (June 9, 2001)).

"it can be said at the outset that there is no possibility the Government would prevail").

■ Citing the Anti–Injunction Act, the District sought dismissal of both petitions, except as to petitioners who had satisfied the jurisdictional test by first resorting to the statutorily-prescribed administrative review. In considering the District's motions, the Tax Division focused on the allegations in the petitions that class members were deprived of due process in that OTR failed to give them adequate notice of the reason for the changed assessments. In an order dated June 10, 2003, the court denied the District's motion to dismiss the Craig petition on the ground that "Petitioners ... *could prove* inadequate notice of their assessments" (italics added). On the same date, the court likewise declined to dismiss the Ernst petition, reasoning that

> the petitioner *could prove* that the respondents did not provide the petitioner with reasonable notice of the tax year 2002 real property assessments and taxes. Without such notice, *there may not have been adequate opportunity to file for administrative review* and appeals to the Board of Real Property Assessments and Appeals with respect to such assessments. Without such opportunity, there is no requirement to exhaust administrative remedies prior to seeking relief in the Superior Court.

(Emphasis added.)

The court's reasoning that petitioners might have been able to prove that class members' assessment notices were inadequate fell far short of a determination that the District "had no chance of success on the merits" and "could under no circumstances ultimately prevail," *Prof'l Eng'rs, Inc.*, 527 F.2d at 600, as to petitioners' due process claims. Accordingly, the petitions' due process allegations did not afford a basis for the Tax Division to exercise jurisdiction in spite of the "rightly stringent" bar of the Anti–Injunction Act.[16] *Eastern Trans–Waste*, 758 A.2d at 13 n. 22.

The tax year 2002 assessment notice and correspondence that OTR sent to property owners on April 27, 2001, a sample of which is contained in the record, included a cover letter to the property owner stating that her property had been reassessed for taxation purposes for tax year 2002 and enclosing a proposed assessment notice that, the cover letter explained, reflected the Real Property Assessment Administration ("RPAA") estimate of market value for the property as of January 1, 2001. The cover letter explained that property owners could learn more about their assessments, including the "assessment data, property sales lists, and property data worksheet information" by telephone, by visiting the RPAA's offices during regular business hours, by visiting the District's web site via the Internet (which, the letter noted, was available at most public libraries), or by mail by returning an information request form on the bottom of the notice. The actual dollar figure of the proposed assessment for TY 2002 was set forth on a form entitled "Notice of Proposed Real Property Assessment for Tax

---

16. We might hold otherwise had the undisputed allegation been that property owners received no notice of their proposed assessments; or that the window of time within which owners could pursue their administrative remedies had closed before owners actually received notice; or that the assessment-notice correspondence did not inform taxpayers of the administrative review process or failed to provide information about how property owners could obtain additional information. *Cf. McDowell v. Southwest Distrib.*, 899 A.2d 767, 768 (D.C.2006) (noting that a prerequisite to invoking the jurisdictional bar in an unemployment compensation appeal is an unambiguous notice to the claimant about the right to appeal).

Year 2002," which listed the then-current assessed value and the proposed assessed value for TY 2002. Any increase in assessment was explained as "Resulting from Annual Revaluation." The assessment correspondence also gave notice of the taxpayer's appeal rights, explaining the availability of a first-level appeal to the OTR assessor, a second-level appeal to the BRPAA, and a third-level appeal to Superior Court. The correspondence advised that a property owner could file a first-level appeal by completing the form at the bottom of the Notice of Assessment and filing it with OTR within 30 days. The taxpayer could submit a written explanation and documentation as to why she deemed the assessment inaccurate, or request an in-person hearing with the assessor.

■ Thus, among other things, the notice described how property owners could access assessment data, enabling them to discover the challenged assessment methodology (as petitioner/appellee Craig and others did).[17] We cannot say that the assessment notice was so deficient (if it was deficient at all) that the District had no chance of success in defending against the petitions' due process claim. At the very least, the merits of the due process claim were "sufficiently debatable to foreclose" the Tax Division from finding at the outset that under no circumstances could the District prevail.[18] *Barry,* 563 A.2d at

---

**17.** *Cf. Keyes,* 362 A.2d at 733 (rejecting the argument that, because of the District's concealment of its debasement factor plan, taxpayers could not have pursued their administrative remedies, reasoning that the taxpayers were aware that their tax bills had been increased and could have discovered facts about the debasement factor by pursuing a timely administrative challenge, just as other taxpayers had done). Because a property owner will not be entitled to a refund if the "assessment as a whole is fair and accurate," *Wash. Post Co. v. District of Columbia,* 596 A.2d 517, 521 (D.C.1991), the critical information in the assessment notice is the amount of the assessment, not how it was determined.

**18.** The Tax Division did not make preliminary findings about the petitions' other claims, but a similar conclusion would apply to them. Our discussion in section II.C *infra,* about why summary judgment and the relief the court granted were not appropriate, explains why this is so for some of the allegations. As to the petitioners' allegation that use of the trending methodology was "not authorized by law" (a claim that we have no occasion to discuss further in the analysis that follows), the following points (and perhaps others) would have made it impossible to conclude at the outset that the District had no possibility of prevailing.

Petitioners/appellees contend that the trending methodology was not authorized by District law because the methodology was not a "comparable sales approach to valuation"

authorized by 9 DCMR § 307.3 (and, presumably, it also was neither a "replacement cost approach to valuation" authorized by 9 DCMR § 307.4, nor an "income approach to valuation" authorized by 9 DCMR § 307.5). Whether or not that assertion (which the District disputed) is correct, the conclusion that use of trending was contrary to law was at the very least thrown into doubt by the regulation also authorizing the use of "any other method [of valuation] the Deputy Chief Financial Officer deems necessary to arrive at estimated market values." 9 DCMR § 307.2. *See also* 9 DCMR § 304.2 (authorizing the Mayor to "designate geographic assessment areas for purposes of analyzing market values"). At the time the class-action petitions were filed, the Tax Division was given no information negating the possibility that the Deputy Chief Financial Officer deemed it necessary to use the trending methodology to arrive at estimated market values.

Moreover, D.C.Code § 47-825.01(i) provides that the BRPAA may not adjust assessments "solely on the basis of average ratio studies comparing sales and assessments, *unless such studies are the primary basis for the assessment* or reassessment of the concerned property" (italics added). This language implies that assessment-sales ratios *may* be used to establish proposed assessments. Further, at the time the petitions were filed in 2002, there was case law in at least one other jurisdiction that (like the District) taxes real property on the basis of estimated market value, upholding the use of area median sales/assess-

1076 (quotation marks and citation omitted). Accordingly, the first criterion for an exception to the Anti–Injunction Act was not satisfied.

### 3. Class Members Had an Adequate Remedy at Law.

■ The class-action petitions fared no better with respect to the second criterion for an exception to the Anti–Injunction Act, the adequacy of any legal remedy. Our case law and persuasive federal case law establish that a taxpayer has an adequate legal remedy if she has a "full opportunity to litigate [her] tax liability in a refund suit." *Tolu,* 906 A.2d at 277 (internal quotations and citations omitted). Under the scheme prescribed by D.C.Code § 47–825.01(f–1) and (j–1), property owners have such an opportunity. *See Nat'l Trust for Historic Pres. v. District of Columbia,* 498 A.2d 574, 576, 577 (D.C.1985) (noting that because the Tax Division may inquire into all relevant questions of law and fact, the real property taxation law "provides adequate remedies to appellants.").

As already noted, class members had an opportunity to contest their assessments in a first-level appeal to OTR and a second-level appeal to the BRPAA, and thereafter to file a refund suit if they remained aggrieved.[19] At each level they would have been entitled to raise all of their claims about why their assessments were invalid and to obtain *de novo* review. *See Tolu,* 906 A.2d at 277 ("If the administrative agency acts arbitrarily in a tax refund suit, the courts are available on appeal to correct the unlawful action. This availability affords the petitioners an adequate remedy."); *Square 345 Assocs. Ltd. P'shp. v. District of Columbia,* 721 A.2d 963, 966 (D.C.1998) ("It is within the trial court's broad discretion as the finder of fact to sift

ment ratios to trend previous assessments for the purpose of establishing current assessed values. *See Sirrell v. New Hampshire,* 146 N.H. 364, 780 A.2d 494, 497–98 (2001) (upholding property tax assessments determined by "establish[ing] an individual sales/assessment ratio based upon the sales and assessment information from each municipality for each property used in the study," "calculat[ing] [median and weighted mean] ... ratios based upon the assessment and sales information for each municipality," and "us[ing] the selected ratio to adjust the municipality's assessed values, either upward or downward, in order to approximate full value").

The petitions asserted that another way in which the District acted contrary to law in implementing the tax year 2002 assessment methodology is that the assessment notices "did not give any reason for the particular assessments," as appellees contend was required by D.C.Code § 47–824. However, as the District points out, the assessment notices were issued only after the D.C. Council had passed emergency legislation revising the D.C.Code provisions that specify the required content of assessment notices. Although D.C.Code § 47–824(b)(3)(E) required assessment notices to include *inter alia* "[a]n indication of the reason for any change in the assessment," the D.C. Council voted to repeal subparagraph (E) on April 18, 2001. *See* Real Property Tax Assessment Transition Emergency Act of 2001, 48 D.C.Reg. 3844, 3846 (2001). Thus, it appears that, at the time the assessment notices were issued, section 47–824(b)(3) no longer contained a requirement that assessment notices indicate or explain the reason for the change in assessment. *See* D.C.Code § 1–204.12(a) (emergency legislation takes effect immediately upon enactment).

**19.** We note that it has long been established that post-payment remedies satisfy the requirements of due process in the tax context. *See McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco,* 496 U.S. 18, 37, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) ("[I]t is well established that a State need not provide pre-deprivation process for the exaction of taxes."); *see also Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n,* 515 U.S. 582, 587, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995) ("The States are afforded great flexibility in satisfying the requirements of due process in the field of taxation.").

through the evidence and arrive at an independent valuation."); *Wash. Post,* 596 A.2d at 521 n. 2 ("[W]hen a taxpayer appeals to the Superior Court, the case is subject to de novo evaluation . . . and the whole case, both facts and law, is open for consideration." (internal punctuation marks and citations omitted)); *cf. Amos v. Glynn County Bd. Of Tax Assessors,* 347 F.3d 1249, 1257–58 (11th Cir.2003) (state remedy was plain, speedy and efficient even if taxpayer had to resort first to administrative procedures and await *de novo* review by state trial court and appellate courts of constitutional issues). The administrative appeals/tax refund suit process afforded an adequate legal remedy not only for substantive challenges to the tax year 2002 assessment methodology, but also for any procedural claims property owners sought to raise. *See Nat'l Trust for Historic Pres.,* 498 A.2d at 577 n. 4 ("Appellants claim they have been injured by the procedures, rather than the assessment itself. We conclude that the correction of the assessment, if correction is warranted, with accompanying refund or credit, is an adequate remedy for any shortcomings in procedure.").

Furthermore, the statutorily-prescribed appeal process afforded property owners opportunities to discover facts about the assessment methodology:

> Super. Ct. Tax R. 3(a) incorporates the general civil rules of procedure concerning discovery, thereby providing the taxpayer with adequate means to learn beforehand the methodology used by the District's assessor and prepare any challenge to its correctness. Moreover, although the administrative review procedures the taxpayer must pursue antecedently are informal and often non-adversarial . . ., they furnish an additional opportunity for the taxpayer to discover the basis of the assessment and initiate any attack upon it.

*YWCA of the Nat'l Capital Area, Inc. v. District of Columbia,* 731 A.2d 849, 852 (D.C.1999) (internal quotation marks and citations omitted).

Appellees focus on the refusal of OTR, the District's Chief Financial Officer, and the BRPAA Chair to respond to Craig's request that all affected properties—not just Craig's own property—be re-assessed. However, a property owner's administrative appeal/refund suit remedy is not rendered inadequate simply because no taxpayer has the right to challenge the assessments of others or to obtain group-wide relief. The Supreme Court has recognized a "general prohibition on a litigant's raising another person's legal rights," *Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (internal citation and quotation omitted), and "Supreme Court precedent is unambiguous that a state court remedy may be 'plain', even where the sole relief afforded by the state is an individual refund. . . ." *Amos,* 347 F.3d at 1262 (citing *California v. Grace Brethren Church,* 457 U.S. 393, 416, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982), and *Rosewell v. La Salle Nat'l Bank,* 450 U.S. 503, 523, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981)).

The fact that resort to the statutorily-prescribed administrative process may be time-consuming does not mean that the process affords an inadequate legal remedy. *See Rosewell,* 450 U.S. at 514, 521, 101 S.Ct. 1221 (construing the federal Tax Injunction Act and noting that the touchstone for whether a taxpayer has a "plain, speedy, and efficient" remedy is whether she is entitled to a "full hearing and judicial determination at which she may raise any and all constitutional objections to the tax," and concluding that "we cannot say that respondent's 2–year delay falls outside the boundary of a 'speedy' remedy" (internal quotations and citations omit-

ted)); *Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428, 433 (2d Cir. 1989) (delays in excess of ten years which resulted in part from delays in state court administration did not undermine the proscription of the Tax Injunction Act).

Finally, we note that the assessment methodology in dispute here is unlike the practice at issue in *Green*. In *Green*, the District had adopted a new debasement factor, *i.e.*, the percentage of a property's assessed value that was subject to taxation, changing the percentage from 55% to 60%. *See* 310 A.2d at 851. The problem for aggrieved taxpayers was that while resort to the statutorily-prescribed appeal process could enable them to obtain a favorable adjustment in the assessed value of their properties, through that process they could obtain no relief from the increased debasement factor. Thus, the prescribed process did not afford an adequate remedy. *See id.* at 857 (fair market value was the only element of the tax formula to which taxpayers could meaningfully object through the administrative review process, meaning that with regard to the debasement factor, taxpayers were "totally remediless within the normal avenue for seeking redress"). This is not the case here. As shown by the example of petitioner Craig, a taxpayer who challenged his proposed assessment derived through use of the across-the-board neighborhood multipliers could obtain a new assessment—and complete relief from the effects of the disputed methodology—through the administrative appeal/refund suit process.

**B. 42 U.S.C. § 1983 Did Not Confer Jurisdiction or Authorize the Tax Division to Provide Relief to the Certified Class.**

 The remaining issue we must address to explain why the Tax Division was without authority to exercise jurisdiction over these purported class action suits is whether the suits were authorized under 42 U.S.C. § 1983.[20] The Tax Division specifically held that it had jurisdiction under section 1983. Citing authority that exhaustion of administrative remedies is not a prerequisite to suits brought under section 1983,[21] respondents/appellees argue strenuously that section 1983 provided a basis upon which the court could entertain claims on behalf of the entire certified class. This argument is mistaken.

 To begin with, section 1983 creates a cause of action but "does not by itself confer jurisdiction...." *Hagans v. Lavine*, 415 U.S. 528, 535, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *see also Johnson v. United States*, No. 97–5107, 1998 WL 39162, *2, 1998 U.S.App. LEXIS 1618, *4 (Fed.Cir.1998) (" 'Section 1983 is not a jurisdiction-granting statute.' " (quoting *Blassingame v. United States*, 33 Fed.Cl. 504, 505, *aff'd*, 73 F.3d 379 (Fed.Cir. 1995))). State courts such as the Superior Court "are generally not free to refuse enforcement of [a] federal claim" where "the same type of claim, if arising under state law, would be enforced in the state courts...." *Martinez v. California*, 444 U.S. 277, 283–84 n. 7, 100 S.Ct. 553, 62

**20.** 42 U.S.C. § 1983 provides in relevant part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution

> and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**21.** *See Miller v. District of Columbia*, 587 A.2d 213, 215 (D.C.1991) ("The exhaustion of District administrative remedies is not a prerequisite to bringing an action pursuant to § 1983 in the local courts of the District.").

L.Ed.2d 481 (1980). But, contrary to appellees' suggestion, the Supreme Court has never said that state courts must entertain all claims brought under section 1983. *See id.* at 283 n. 7, 100 S.Ct. 553 ("We have never considered, however, the question whether a State *must* entertain a claim under § 1983. (emphasis in original)). As summarized by one commentator, '[s]tate courts are obligated to entertain federal causes of action *whenever their jurisdiction is adequate to adjudicate similar claims* ....' William L. Taylor, *Section 1983 in State Court: A Remedy for Unconstitutional State Taxation,*" 95 YALE L.J. 414, 423 (1986) (citing, *inter alia, Testa v. Katt,* 330 U.S. 386, 394, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (a state court generally may not deny enforcement of a valid federal claim if the court has "jurisdiction adequate and appropriate under established local law" to adjudicate similar claims)). *See also Howlett v. Rose,* 496 U.S. 356, 374–75, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (noting that the Court has upheld state courts' refusal to entertain federal causes of action in cases involving "a neutral rule of judicial administration").[22]

Even more to the point, the Supreme Court has recognized that where state law limits the jurisdiction of state courts to entertain suits challenging state taxation, section 1983 does not afford taxpayers a way to circumvent those jurisdictional restrictions. The Court decisively addressed this very issue in *Nat'l Private Truck Council,* explaining that:

> [T]he background presumption that federal law generally will not interfere with administration of state taxes leads us to conclude that Congress did not authorize injunctive or declaratory relief under § 1983 in state tax cases when there is an adequate remedy at law.... In determining whether Congress has authorized state courts to issue injunctive and declaratory relief in state tax cases, we must interpret § 1983 in light of the strong background principle against federal interference with state taxation. Given this principle, we hold that *§ 1983 does not call for either federal or state courts to award injunctive and declaratory relief in state tax cases when an adequate legal remedy exists.* ... Whether a suit is brought in federal or state court, Congress simply did not authorize the disruption of state tax administration in this way ... Declaratory relief in state tax cases might throw tax administration "into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law." [citation omitted] *We simply do not read § 1983 to provide for injunctive or declaratory relief against a state tax, either in federal or state court, when an adequate legal remedy exists.*

515 U.S. at 588, 589, 590, 591, 115 S.Ct. 2351 (italics added). The Court concluded that "[w]hen a litigant seeks declaratory or injunctive relief against a state tax pursuant to § 1983, ... state courts, like their federal counterparts, *must refrain* from granting federal relief under § 1983 when there is an adequate legal remedy." *Id.* at 592, 115 S.Ct. 2351 (emphasis added). As already discussed, the administrative appeal/tax refund suit process established by

---

**22.** *See also id.* at 371–73 (State courts may not discriminate against federal causes of action and may not "dissociate themselves from federal law because of disagreement with its contents," but "federal law takes the state courts as it finds them," and state courts "may apply their own neutral procedural rules to federal claims"); *Second Employers' Liability Cases (Mondou v. New York),* 223 U.S. 1, 59, 32 S.Ct. 169, 56 L.Ed. 327 (1912) (rights arising under federal act "may be enforced, as of right, in the courts of the States when their jurisdiction, as prescribed by local laws, is adequate to the occasion").

D.C.Code §§ 47–825.01(f–1) and (j–1) afforded property owners an adequate remedy for challenging their tax year 2002 assessments. Accordingly, the Tax Division was required to refrain from entertaining the class-action petitions under section 1983.[23]

To summarize, the Tax Division made no finding that, at the time these actions were commenced, the District defendants/appellants could "under no circumstances" ultimately prevail; class members had an adequate remedy at law; and section 1983 did not confer jurisdiction. Accordingly, the Anti–Injunction Act bar applied, and the Tax Division did not have authority to entertain the claims of the purported class members who had not met the jurisdictional prerequisites to participate in a refund suit with respect to their tax year 2002 real property taxes.[24]

**C. After Remand, If the Tax Division Permits These Actions to Proceed upon Amended Petitions, Some Claims Will Not Survive, and as to the Remaining Claims, Summary Judgment Is Not Appropriate.**

For the reasons discussed above, the Tax Division erred in certifying a class that included property owners who had not pursued the administrative review process through OTR and the BRPAA. We therefore vacate the class certification order. A remand is appropriate, so that the Tax Division may determine whether to permit amendments to the petitions and whether to entertain any motion for certification of an amended class. As we explain *infra,* several of the claims do not survive upon vacatur of the class certification order. We also explain why summary judgment is inappropriate as to the remaining claims (a discussion that has implications for the

---

**23.** Citing our post-*Nat'l Private Truck Council* decision in *United Jewish Appeal Fed'n,* Craig argues that section 1983 "has been freely applied to tax issues in this jurisdiction." However, *United Jewish Appeal Fed'n* was brought under section 1983 by a mortgagee that had not received notice of a tax sale, to void the sale of the mortgaged property. We held that the blanket cancellation of the tax violated the Anti–Injunction Act, *see* 672 A.2d at 1079, but we declined to hold that the entire action should not have been brought in the Superior Court, "caution[ing] that the word 'tax' is not a talisman that deprives the trial court of jurisdiction to remedy wrongs with which tax questions are intertwined." *Id.* at 1080.

**24.** Not only were jurisdiction of the class action and class-wide injunctive relief barred by the Anti–Injunction Act, but also it is questionable whether the traditional requirements for injunctive relief could have been met in these cases. As we said in *Keyes,*

However erroneous such practices have been found to be, they cannot, consistently with the objects of equity jurisprudence, be viewed in isolation or without regard to the practical consequences which the requested

retrospective relief would have. This court is confronted with the task of attempting to reconcile competing claims to equity, these being the financial interest of the assumedly wronged appellees on the one hand, and the financial interest of the District of Columbia as it relates to all of the people whom it serves, on the other hand.... The funds collected ... have already been disbursed for governmental purposes which have benefitted all of the citizens of the District of Columbia and the refunds sought here would have to be financed through increased taxes or decreased services.... [T]he adverse impact of refunds on the entire citizenry of the District outweighs the economic interest of the property owners who paid the taxes at issue.

*Keyes,* 362 A.2d at 736–37; *see also Kleiboemer,* 458 A.2d at 735 ("In addition, although without question the District had 'notice' of the class action challenging the legality of the tax, absent the expected filing of claims at the administrative level, the District could not know the full extent of its liability for refunds and could not plan its budget accordingly.... [T]he financial interests of the District and the public interest would not be served by allowing taxpayers in such a case to bypass the statutory procedures for refund.").

relief that would be available if these actions proceed and petitioners prevail).

### 1. Parties

■■■ Superior Court Tax Rule 6 requires that each petition for review shall contain in a numbered paragraph "the petitioner's name and the address of the petitioner's principal office or residence." Petitioners Craig and Ernst included their own addresses in the captions of their petitions and attached appendices listing the names and addresses of other taxpayers on whose behalf the petitions were brought. It appears that the Tax Division deemed this format adequate to establish petitioner status for each individual identified in the appendices. We deem it adequate to establish petitioner status for each individual identified in the appendices who met the jurisdictional prerequisites, *i.e.*, a prior administrative appeal to OTR and the BRPAA; the listed individuals who failed to meet the jurisdictional prerequisite must be dismissed as parties. The Tax Division will need to determine whether to entertain a motion by the surviving named petitioners to certify a modified class consisting only of taxpayers who

are aggrieved by the tax year 2002 assessments, paid their taxes in full, and satisfied the jurisdictional prerequisite by virtue of having pursued the statutorily prescribed administrative remedies,[25] and whether to permit other taxpayers who were members of the certified class to join as petitioners.[26]

### 2. Claims That Are Moot or Premature

For any remaining petitioners or amended-class members, the assessments that they are challenging will be their individual assessments as confirmed or adjusted by OTR and/or BRPAA during the administrative review process. Presumably, the challenge will no longer be with respect to the proposed assessments that resulted from application of the across-the-board neighborhood multipliers.[27] Therefore, some of the claims set out in the petitions will likely be moot. These include the claims that the trending methodology was arbitrary and that use of it was contrary to law.[28]

As to the due process claim set out in the petitions, the posture on remand is

---

**25.** The Tax Division would, of course, need to consider the criteria governing class certification set out in Super. Ct. Civ. R. 23, incorporated by reference in Super. Ct. Tax R. 3.

**26.** We note that although D.C.Code § 47–825.01(j–1) generally requires an appeal to the Superior Court from a proposed tax assessment "before October 1 of the next succeeding tax year," the Tax Division could deem that requirement met by property owners who met the jurisdictional prerequisites, were members of the erroneously certified class, and move to join as petitioners within a reasonable time after remand. *Cf. Curtin v. United Airlines, Inc.*, 348 U.S.App.D.C. 309, 314, 275 F.3d 88, 93 (2001) ("The filing of a class action tolls the statute of limitations as to all asserted members of the class ...." (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983))).

**27.** We make this presumption because the record suggests that the BRPAA modified or sustained proposed assessments on the basis of property-specific information submitted by OTR or the property owner (such as information about comparable sales or the condition of the property), rather than on the basis of the trending methodology (which the BRPAA agreed produced flawed results). If, in any cases, the BRPAA decision was based on the trending methodology, the validity of that methodology would be subject to review by the Tax Division.

**28.** The District raises a number of evidentiary issues, such as about the credentials and qualifications of appellees' affiants who offered expert opinions about the validity of the trending methodology, which likewise are likely moot.

dictated by the principle that government "must have the opportunity to 'remedy the procedural failings of its subdivisions and agencies in the appropriate fora ... [such as] state courts' before being subjected to a claim alleging a procedural due process violation." *Cotton v. Jackson,* 216 F.3d 1328, 1331 (11th Cir.2000) (quoting *McKinney v. Pate,* 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc)); *see also Greenfield Mills, Inc. v. Macklin,* 361 F.3d 934, 961 (7th Cir.2004) ("due process challenges are premature if the plaintiff has not exhausted possible state remedies by which to attack the ... [challenged] state action" (citation omitted)). A due process claim as to any remaining petitioners must be dismissed on ripeness grounds, because—by virtue of their continuing in the administrative review/tax refund process—such petitioners have not yet allowed the statutorily-prescribed process to run its course (a course that includes review by the Tax Division of individual assessments, and may thereafter include review by this court).

### 3. Relief That Will Not Be Available upon Remand

As relief, petitioners/appellees sought a roll-back of assessments to the prior assessment levels (as calculated for TY 1999). In awarding the requested relief, the Tax Division cited the similar relief ordered in *Green.* In *Green,* however, we held that "the agency was, in effect, applying new rules without following the required rulemaking procedures," *Nat'l Trust for Historic Pres.,* 498 A.2d at 577 n. 4, and the remedy we ordered (reinstatement of prior assessments rather than reassessment, to a reasonable estimate of market value, of each property) was consistent with that holding. *Cf. Georgetown Univ. Hosp. v. Bowen,* 261 U.S.App.D.C. 262, 270, 821 F.2d 750, 758 (1987) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). A similar remedy is not available here be-

cause, for the reasons discussed below, petitioners' DCAPA claim must be dismissed. The trending methodology was not a "rule" that could be implemented only after notice-and-comment rulemaking.

The petitions alleged that implementation of the trending methodology represented "adoption of a rule, which requires adherence to the rulemaking procedures of the DCAPA, D.C.Code §§ 2–501 to 2–510." Under the DCAPA, a "rule" is defined as "the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret or proscribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency." D.C.Code § 2–502(6)(A). Our case law interpreting section 2–502(6)(A) is sparse. However, the federal Administrative Procedure Act (the "federal APA") contains a similar definition (a rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4)). When we have construed other DCAPA provisions that are only slightly different from federal APA provisions, we have concluded that "it is appropriate for us to seek guidance from federal court interpretations of the APA [ ] ... requirements." *Lee v. District of Columbia Bd. of Appeals & Rev.,* 423 A.2d 210, 216 (D.C.1980); *see also Timus v. District of Columbia Dep't of Human Rights,* 633 A.2d 751, 780 n. 2 (D.C.1993) (Steadman, J., dissenting) ("The legislative history of the District of Columbia Administrative Procedure Act indicates that although it is somewhat different from the federal Administrative Procedure Act ..., it is generally to be interpreted akin to the federal APA."); *Citizens Ass'n of Georgetown v. Zoning Comm'n of District of Columbia,* 392 A.2d 1027, 1038 (D.C.1978) ("the DCAPA requirements as to notice and comment [prior to the adoption of any

rule] are closely analogous to the requirements of the Federal Administrative Procedure Act").

A federal APA case that provides pertinent guidance is *Pac. Gas & Elec. Co. v. Fed'l Power Comm'n,* 164 U.S.App.D.C. 371, 506 F.2d 33 (1974). In that case, the District of Columbia Circuit discussed the difference between substantive "rules," which must be promulgated through notice-and-comment rulemaking to be valid, and policies that need not be promulgated through rulemaking. *See id.* at 375, 506 F.2d at 37. The court explained that

[a] properly adopted substantive rule establishes a standard of conduct which has the force of law.... The underlying policy embodied in the rule is not generally subject to challenge before the agency.... A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed.

*Id.* at 376, 506 F.2d at 38 (footnote omitted); *see also Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369 (11th Cir. 1983), in which the court explained that

[g]enerally, whether a particular agency proceeding announces a rule or a general policy statement depends upon whether the agency action establishes "a binding norm." ... The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand,

whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm....

*Id.* at 1377 (citations omitted).

■ Considered in light of the foregoing analytical framework, the assessment methodology at issue here cannot reasonably be considered a rule.[29] The District used the challenged trending methodology to establish proposed assessments, the first step in establishing an estimate of market value for each affected property. In all cases, the proposed assessment was subject to reconsideration and possible adjustment upon the property owner's request to OTR (and subsequently, the BRPAA) for an administrative review. *See District of Columbia v. New York Life Ins. Co.,* 650 A.2d 671, 672 (D.C.1994) (the administrative review process "exists to give the taxpayer an informal and speedy opportunity to be heard before an assessment becomes final"). As with petitioner/appellee Craig's proposed assessment, during the review process OTR and the Board were free to take into account any and all available information pertinent to market value, and any more precise or reliable estimation approaches, without being constrained by the value derived from the trending methodology.[30] In short, although the trending methodology was used broadly to establish proposed assessments

---

**29.** Appellees urge us to follow the analysis in *Green,* where we said that the disputed change in the real property "debasement factor"—*i.e.,* the specified percentage of estimated market value that was treated as each property's "true and full value" for tax purposes—amounted to a "rule" under the DCA-PA. *See* 310 A.2d at 854. Appellees' reliance on *Green* is misplaced. As we explained in that case, adoption of a new debasement was a "rule" because, like the tax rate, the debase-

ment factor is a "fixed value [ ] in the assessment equation." *Id.* Stated differently, adoption of a new debasement factor amounted to adoption of a new binding norm, whose application was not subject to agency discretion in individual cases. The same cannot be said about the trending methodology in dispute here, in cases where property owners appealed their assessments.

**30.** "The regulations promulgated under the [tax] statute ... give the [District's] Director

for residential properties in Triennial Group I, it did not amount to a rule because it did not establish, for any property, a binding norm or a value that was "finally determinative of the issues or rights to which it is addressed." *Pac. Gas & Elec.,* 164 U.S.App.D.C. at 376, 506 F.2d at 38. OTR and the Board were left "free to exercise ... discretion to follow or not to follow" the results of the trending methodology in individual cases, and they "remain[ed] free to consider the individual facts in the various cases" brought before them for administrative review. *Ryder Truck Lines,* 716 F.2d at 1377. Accordingly, the trending methodology was not a rule. We reverse the Tax Division's ruling that "trending should have been subject to rulemaking under the [DC]APA" and instruct the court to dismiss the DCAPA claim.

### 4. Remaining Issues of Fact That Will Preclude Summary Judgment on the Equal Protection Claim, If It Is Allowed to Proceed on Amended Petitions.

As to the remaining claim in the petitions—that the tax year 2002 assessments denied equal protection of the law [31]—any remaining petitioners can be entitled to relief only if they show, *inter alia,* that their assessments resulted in a level of taxation with respect to the market value of their properties that exceeded the level of taxation applied to other taxpayers' properties (stated differently, that other property owners have effectively been taxed at smaller percentages of the fair market value of their properties).[32] Thus, to survive dismissal of their claims, any remaining petitioners must allege facts about their own assessment levels and the market values of their own properties. The petitions here, however, are devoid of such detailed allegations. As Craig acknowledged in his pleadings before the Tax Division, his challenge was "generic to the new methodology rather than specific to the individual properties held by each class member." Accordingly, if these actions are to proceed upon remand, amendments to the complaint will be required. Remaining petitioners will need to determine whether to seek amendment of the petitions to allege facts that may enable the petitions to survive a motion to dis-

of Finance and Revenue discretion in choosing the method or approach for an assessor to use *in estimating the market value of a particular property.* ... [O]ne method may be most appropriate depending on the individual circumstances of the subject property." *Safeway Stores, Inc. v. District of Columbia,* 525 A.2d 207, 209 (D.C.1987) (italics added) (internal quotations and citation omitted).

**31.** "*Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), reads the Fourteenth Amendment equal protection clause into the due process clause of the Fifth Amendment to apply it to the District of Columbia." *Green,* 310 A.2d at 855 n. 15. Under the principle established by D.C.Code § 47–820(a)(3), that "assessed value for all real property shall be the estimated market value of such property," the guarantee of equal protection means that "[t]he amount of a property owner's tax bill must be related as

nearly as possible to the value of his property as compared to the value of the property of others. The ratio of his property's value to the total value of property in the District should parallel the amount of tax he pays compared to total taxes paid by all property owners." *Id.*

**32.** A taxpayer who succeeds in proving a violation of equal protection is entitled "to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of the statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 446, 43 S.Ct. 190, 67 L.Ed. 340 (1923).

miss, and the Tax Division must determine in its discretion whether to grant any such motion.

■ If any remaining petitioners do seek and are granted leave to amend the petition to state a claim that their individual assessments violated the guarantee of equal protection, summary judgment would be unwarranted on the present record. It is well-established that "[t]he intentional and systematic relative undervaluation of comparable property . . . over time . . . denies . . . the equal protection of law." *See Wash. Post,* 596 A.2d at 521 (quoting *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty.,* 488 U.S. 336, 346, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (concerning discrepancies that "continued for more than 10 years with little change")). "[I]n the assessment context, . . . the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners . . . . [and e]rrors of judgment and reasonable mistakes are not enough to deny a taxpayer equal protection. . . ." *Wash. Post,* 596 A.2d at 522 (internal citation and quotations omitted).

■ The record that was before the Tax Division was insufficient to sustain a grant of summary judgment for the petitioners. Among other things, appellees were required to prove—and any remaining petitioners will be required to prove with respect to their adjusted assessments—undervaluation of comparable properties *"over time." Id.* at 521 (italics added) (citations omitted). Thus, they needed to present evidence about "how long such inequities will persist." *Nash v. Assessor of Southampton,* 168 A.D.2d 102, 571 N.Y.S.2d 951, 955 (N.Y.App.Div.1991). This appellees failed to do. Moreover, we take judicial notice that the D.C. Council took conditional corrective measures to address disparities in real property taxation. *See* 52 D.C.Reg. 7667, 7716–17 (Aug. 12,

2005) (the "Triennial Group Taxable Assessment Disparity Correction Act of 2005, effective for tax year 2006, amending D.C.Code § 47–864(b)(i)(A)(I) and providing for recalculation of the prior year's taxable assessment" by applying a 12% cap as of October 1, 2001). This may have a bearing on petitioners' ability to make the showing of persistent inequities that would be necessary to support a claim that the guarantee of equal protection has been violated.

Furthermore, the District vigorously disputed the claim that it intentionally discriminated against any group of property owners. *Cf. Sirrell,* 780 A.2d at 505 ("What the plaintiffs proved was that the taxing system is flawed. What they did not prove is that the flaws resulted in a systematic pattern of disproportionate taxation. Nor did the plaintiffs prove that the flaws produced such substantial inequality that the inequality must be deemed intentional."); *Young v. Delaney,* 647 A.2d 784, 790 (D.C.1994) ("summary judgment is probably not appropriate and should be granted sparingly in cases involving motive or intent as material elements."). Also, the District's expert witness Robert Gloudemans criticized appellees' allegations of "discriminatory results" as based on analysis that is "totally misleading and an affront to impartial statistical analysis" and that creates a "a statistical illusion." Thus, triable issues of fact remain, whereas "[t]o prevail upon a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact. . . ." *Potts v. District of Columbia,* 697 A.2d 1249, 1251 (D.C.1997).

Accordingly, if these suits proceed further in the Tax Division upon amendments to the pleadings, further development of the record will be required.

*Reversed and remanded for further proceedings consistent with this opinion*